UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-20674-CR-DPG

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

MOHAMMAD MEHDI SALEMI, et. al.,

*Defendants*.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . ./

## REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S PSI OBJECTIONS AND SENTENCING MEMORANDUM

Defendant Mohammad Mehdi Salemi, through undersigned counsel, hereby replies to the government's responses (DE:256 & 257) to defendant's objections to the presentence report ("PSI") (DE:253) and his sentencing memorandum (DE:254). Counsel further state as follows:

The government's responses to the defendant's PSI objections and sentencing memorandum substantially narrow the scope of the contested sentencing issues as between the parties. In reply, defendant will address two principal unresolved guideline calculation questions and address his complete agreement with the government explanation of the significance of his mislabeled documentation offense of conviction under 18 U.S.C. §§ 371 and 670.

**1.      Section 670 offense: mislabeling of documentation regarding the purchase history of pre-retail medical products.**  The defendant fully agrees with the government regarding the importance of enforcement of Section 670's criminal punishment for mislabeling of pedigree (purchase history) documentation of the medical goods at issue in this case.

1

The defendant has expressed and will continue to express his remorse and acceptance of responsibility for the documentary mislabeling and other offense conduct and for the risk of harm that occurs if there is mishandling of the products at issue. The government presently seeks a sentence of nearly twice the statutory maximum applicable to the underlying conspiracy offense of conviction, while the defense contends that a sentence that is within the range of the other sentences imposed in this case (from approximately 36 to 87 months) would be warranted, given the defendant's complete lack of any prior criminal history, his capacity and desire to engage in a lawful, productive life in the future, and his full and complete cooperation with the government that has led, and will lead, to further interdiction of the offense. Mr. Salemi's efforts to cooperate and to thereby disassociate with any criminal conduct in the future make such a sentence request reasonable. The defense request does not and clearly is not meant to diminish the nature of the conduct which was fully recognized in the defendant's factual proffer, but is consistent with the law and relevant factors under 18 U.S.C. § 3553.

**2. U.S.S.G. § 2B1.1(b)(8)(B) employee/agent enhancement is inapplicable to individual violators such as single-member LLCs.** The government argues that, in the absence of Eleventh Circuit case law regarding this enhancement, the guideline's exclusion of individuals from the additional two-level enhancement under § 2B1.1(b)(8)(B) for a § 670 violation should not be given effect. The defense, contrary to the government, asserts that the text of the guideline, which excludes independent individuals who violate § 670 from receiving the enhancement, show that imposition of the enhancement only for agents or employees of organizations is meant to apply to abuse of an employment/agency status in the organization—taking advantage of the status conferred upon the employee by his employment with the organization in order to commit the offense. That paradigm is not present here.

2

Supporting the defense position are the cardinal principles of statutory interpretation that each word of a statutory provision must be given effect and that the inclusion or specification of one prohibited category implies the exclusion of others. Giving meaning to each word of the relevant guideline provision supports the defense position that the guideline is meant to enhance the sentence when an insider betrayal or misuse of an organization is at issue, and not individual misconduct that does not arise from employment status.

Generally, the Sentencing Guidelines clearly exclude from the term "organization" individuals or disregarded nominal entities such as single-member LLCs. *See* U.S.S.G. § 8A1.1, comment. (n. 1) ("'Organization' means 'a person other than an individual.') (citing 18 U.S.C. § 18). And the Sentencing Commission has used express language when it intends to refer to offense conduct "whether by an individual *or* an organization." *See*, *e.g.*, U.S.S.G. § 2B1.5, comment. (n. 5(B)) (emphasis added). Thus, language in the guidelines distinguishing individuals from organizations is clear. The guidelines provide that an organization does not include an individual. If the guideline enhancement in this case were meant to apply to individuals, it would have specifically said so. Limiting the application and the guideline to agents and employees of an organization restricted the scope of its application.

The contrary interpretation would result in an arbitrary sentencing differential: under the government's theory, if a trucker who is in the supply chain for consumer goods forms a single member LLC, he would be subject to the two-level enhancement. But if the trucker operated in his own name or simply under a d/b/a, there would be no such enhancement. This nominal difference would serve no relevant purpose and should not result in an additional two-level enhancement in this case. The government notes that there could be a separate abuse of trust enhancement under § 3B1.3. But the test for that enhancement would require additional findings

3

and would not result in double counting. Hence the more logical and consistent interpretation of the additional two-level enhancement is that it does not apply to an individual.  That defendant Alvarez in this case did not receive the enhancement clearly shows that a nominal difference should not increase the defendant's guideline sentencing range.

      **3.**      **Guideline text, undisputed factual content of the PSI, and relevant Eleventh Circuit precedent do not support using gross revenue (gain) as a substitute for loss in the context of this consumer products case.**  The government does not dispute that if the money laundering offense guideline calculation methodology of U.S.S.G. § 2S1.1(a)(2) is employed (as urged by the defendant) the resulting sentencing guideline range would be 108 to 135 months.  The government contends instead that employing U.S.S.G. § 2S1.1(a)(1) would achieve a higher guideline level. The government's argument is inconsistent with the current sentencing guidelines and commentary applicable to the finding of pecuniary harm for purposes of § 2B1.1's loss table.

      First, the government's arguments with regard to loss do not address the undisputed factual content of paragraphs 91 and 92 of the PSI which relate facts provided to the probation officer by the government after extensive investigation in this fact-intensive case.  As explained in the relevant paragraphs of the PSI, the government acknowledges that there was no pecuniary harm to any victim in this case, that no victim has claimed any pecuniary harm as to the conduct of any of the conspirators, and more specifically that the harm suffered was instead of a type that is specifically excluded from the loss calculation under U.S.S.G. § 2B1.1, comment. (n. 3(A)(iii)). *See* PSI ¶ 91 (describing reputational and other non-financial risks as the only impact on victims); PSI ¶ 92 ("[T]he government advised that in discussing this case with the known victims, the victims did not indicate that they are interested in submitting a victim declaration affidavit seeking restitution or participating in

sentencing."). These factual representations regarding pecuniary harm were made in prior sentencings in this case as well, and no restitution has been ordered; the undisputed factual findings should not be disturbed. The difference in the other cases is that the defendants apparently agreed to guideline calculations that they deemed favorable to them and thus did not seek application of the relevant loss calculation under the guidelines.

Second, the government's legal argument would divert from both the factual stipulations and both the guideline text and relevant case law, including *United States v. Bazantes*, 978 F.3d 1227, 1251 (11th Cir. 2020) (cited in defendant's objections but not referenced by the government), in which the Eleventh Circuit explained that economic harm cannot simply be presumed based on a misstatement regarding the provenance of the service provider. *Bazantes* is fully consistent with the present version of the guidelines (and the 2018 Manual applicable to this case).

The cases cited by the government, in the factually inapplicable context of drugs lacking FDA approval, all date from the period 1996–2005 and address a *prior* (no longer included) guideline provision of then-applicable U.S.S.G. § 2F1.1 (which itself has been deleted). The government cites no authority under the present guideline regarding consumer goods under which loss is pecuniary only where "*goods* were falsely represented as *approved* by a governmental regulatory agency." § 2B1.1, comment. (n. 3(F)(v)) (emphasis added). In consumer goods cases, there can be a host of misrepresentations made about approved products that might influence a purchaser, but the pecuniary harm guideline is limited (and has remained limited since the time when § 2B1.1 applied).

Tellingly, each of the cases cited by the government, including *United States v. Munoz*, 430 F.3d 1357 (11th Cir. 2005), relates to selling a product that either was not chemically what it was represented to be or was falsely represented to be approved for use when the product itself, regardless of prior purchase history, had

not been analyzed and found safe.  That the guidelines created this very specific exception to the rule for determining pecuniary harm in consumer products cases shows that under either the current or the prior version of the guidelines, there is no pecuniary harm for purposes of the loss table in this case.

Dispositively, the Eleventh Circuit in *Munoz* distinguished the situation presented on the facts of the present case from the FDA approval cases:

> Appellants cite in particular *United States v. Chatterji*, 46 F.3d 1336 (4th Cir.1995), where the Fourth Circuit rejected a loss calculation based on gross drug sales in an FDCA fraud case.  However, the facts in *Chatterji* are so materially different from this case, it does not help Appellants. In *Chatterji*, the drugs, though *technically misbranded*, were "exactly what they purported to be: [specific prescription drugs], approved by the FDA, manufactured in a certain strength and dosage, and producing the specified therapeutic benefits that FDA requirements were intended to ensure." *Chatterji*, 46 F.3d at 1341. It was for this reason alone that the Fourth Circuit found it unreasonable for the district court to consider the entire $13.4 million in the company's gross sales a "loss" for sentencing purposes. *Id.* at 1340–41. The Fourth Circuit reasoned that the submission of technically incorrect testing information to the FDA did not render the drug worthless to customers. *Id.* at 1341–42.
>
> In sharp contrast to *Chatterji*, here the drugs received by U.S. One's customers *barely resembled the drugs described* and marketed by Appellants. As the overwhelming evidence at trial demonstrated, Appellants conspired to mislead potential buyers by informing them that Power Gel and Vigor did not require prescriptions. Appellants also conspired to convince potential customers that Power Gel and Vigor were 100% effective and had no side effects.[15] In fact, no medical evidence whatsoever indicated that tri-mix gel (as opposed to tri-mix injections) or oral phentalomene were effective treatments for erectile dysfunction, and *substantial medical evidence suggested that their use would entail serious risks*.

6

Munoz, 430 F.3d at 1372–73. (emphasis added).

Similarly, the Fourth Circuit, in a case cited by the government, also reaffirmed the vitality of *Chatterji*:

> Marcus, however, fails to grasp the critical difference between the formula change at issue in *Chatterji* and the one at issue here. In *Chatterji*, the modification of the formula for ritodrine was merely an insignificant change that *implicated only the shelf life of the drug*; it was undisputed that the modification *in no way could have affected the bioequivalence of the drug* and thereby its safety or therapeutic value.

*United States v. Marcus*, 82 F.3d 606, 610 (4th Cir. 1996) (emphasis added).

The point of these cases is that even when a misrepresentation *caused* a person to make a purchase, if the product delivered actually was itself actually the product ordered (as a matter of fact as opposed to potentiality), there is no pecuniary loss. Not only *Bazantes*, but other recent Eleventh Circuit cases, including those cited in *Bazantes*, have rejected the government's theory that fraudulently causing a sale to occur necessarily causes a loss.  Most analogously, in *Bazantes*, the victim government entity likely would not have paid the contractor who, misrepresenting the nature of the labor services involved, used low-wage workers; but that did not mean that a loss could be assumed even if the governmental agency likely would not otherwise have paid for the work. *Bazantes*, 978 F.3d 1248 ("The falsified payroll information that was submitted included a certification on a government form that itself indicated the labor was provided for a CDC construction project. And the evidence showed that through the contracting chain of command, the payroll information and certifications were ultimately submitted to the CDC (as the law required them to be).  Other evidence proved that the false payroll information was capable of influencing the CDC … .").  The government's materiality = loss theory does not overcome the Eleventh Circuit's analysis in *Bazantes*.

The choice-of-guideline issue presented in this case is fundamental to correct application of the guidelines.  And although the guideline ranges provided under § 2S1.1(a)(1) and § 2S1.1(a)(2) produce (under defendant's calculations) no difference (with both yielding 108–135 months in the defendant's view), the government suggests that there could be cases in which no money laundering at all was involved and thus the defendant would not face sentencing guidelines as high as in the present case. *See* DE 256, Government Response to PSI Objections at 6.

The government's argument, however, does not change the guideline analysis and presents an unlikely hypothetical in any event.  First, it is unclear that there will be such a non-money laundering case, particularly given that dealings in the proceeds of fraud—even small salary payments—are virtually always reached by the money laundering statute (and charged as such by the government). *See*, *e.g.*, *United States v. Ramirez*, 724 F. App'x 704 (11th Cir. 2018) (money laundering conspiracy conviction upheld for payment of $250 to contract employee).  Second, as a matter of policy, to the extent any such differential could result where no money laundering at all occurred, treating non-pecuniary harm as pecuniary would be inconsistent with the congressional purpose in limiting the statutory maximum for a mislabeling offense under 18 U.S.C. § 670 to only three years. Thus, where there is a mislabeling offense, with no money laundering and no pecuniary harm, it would not be surprising that in such case, an 18 U.S.C. § 371 conspiracy to commit the offense would result in a sentence of five years or less.  Sentences imposed in this case, in the range of three to seven years, are consistent with the congressional purpose manifested in § 670.

## Conclusion

In summary, the defendant agrees completely with the thrust of the government's responses and is deeply ashamed of his conduct in this case. He is equally cognizant of the need for imposition of a prison sentence. However, in light

of the relevant guidelines and statutory penalty structure, we submit that a sentence within the range of those previously imposed in this case would be appropriate.

Respectfully submitted,

*/s/ Richard C. Klugh*
**Richard C. Klugh, Esq.**
Fla. Bar No. 305294
40 N.W. 3rd Street, PH1
Miami, Florida 33128
Tel. (305) 536-1191
Fax (305) 536-2170
E-Mail rklugh@klughlaw.com

**BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.**
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131 / Ph. (305) 371-6421

By:     */s/ Alyssa Silvaggi*
        **ALYSSA SILVAGGI**
        Florida Bar No. 114129
        E-mail: ASilvaggi@RoyBlack.com

*Counsel for Mohammad Salemi*